# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### July 22, 2015 Session

## IN RE: KELSEY L., ET AL.

**Appeal from the Juvenile Court for Rutherford County**
**No. TC2073T      Donna Scott Davenport, Judge**

---

**No. M2014-02416-COA-R3-PT – Filed September 9, 2015**

---

The Juvenile Court for Rutherford County ("the Juvenile Court") terminated the parental rights of Joshua L. ("Father")[1] to the minor children Kelsey L. and Karlie L. ("the Children") after finding and holding that grounds to terminate had been proven by clear and convincing evidence and that it also had been proven by clear and convincing evidence that the termination was in the Children's best interest.  Father appeals the termination of his parental rights to the Children raising a single issue regarding the Juvenile Court's finding as to best interest.  We find and hold that the evidence does not preponderate against the Juvenile Court's findings made by clear and convincing evidence that grounds existed to terminate Father's parental rights to the Children and that it was in the Children's best interest for Father's parental rights to be terminated.  We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which RICHARD H. DINKINS and W. NEAL MCBRAYER, JJ., joined.

Brandon M. Booten, Murfreesboro, Tennessee, for the appellant, Joshua L.

Herbert H. Slatery, III, Attorney General and Reporter; and Rebekah A. Baker, Senior Counsel, for the appellee, State of Tennessee Department of Children's Services.

---

[1] The Juvenile Court also terminated the parental rights of Jessica C. ("Mother") to the Children.  Mother did not appeal the termination of her parental rights to the Children.

# OPINION

## Background

The Children were removed from Mother's and Father's home and taken into State custody on July 6, 2012. They were adjudicated dependent and neglected on September 21, 2012. The Children have remained in State custody continuously since July 6, 2012. The State of Tennessee Department of Children's Services ("DCS") filed its petition to terminate the parental rights of Mother and Father in September of 2013. The case was tried without a jury on multiple days during July and September of 2014.

Father testified at trial that he was incarcerated at that time in Rutherford County. Father was asked when he was arrested, and Father stated that he was extradited from Kentucky on May 30th for violating his probation. Father testified that his underlying charge was for driving on a suspended license and that he violated probation by "not showing up to probation."

Father testified that he attended "all the visits that were required" with the Children between July 6, 2012 and January of 2013. Father admitted that he did not visit the Children from May 27, 2013 to September 27, 2013 or between December 8, 2013 and April 8, 2014. Father was incarcerated in Ashland City for approximately one month between May 27, 2013 and September 27, 2013. Father was not in jail between December 8, 2013 and April 8, 2014. Father admitted that at the time of trial he had not visited with the Children in approximately eighteen months. Father admitted that he paid no child support during the above stated times and that he did not send the Children any cards or letters during those times.

Father testified that since July of 2012 he has had "[p]robably three" phone numbers. When asked if he provided those numbers to the DCS caseworker, Ms. McKinney, Father stated:

> I provided the one that - - when I was seeing my children at the time, when I was doing everything I was supposed to be doing, and everything was up to date and current until the foster parents put charges on me. And I kind of quit seeing the girls because I didn't want to affect how [Mother] was going to get the girls back.

Father has had three addresses since July of 2012. Father admitted that he provided only two of those addresses to DCS.

Father was arrested on January 11, 2013 for driving on a suspended license. He pled guilty to that charge and was sentenced to six months suspended upon payment of fines and costs. Father was arrested in November of 2013 for theft. He pled no contest to the theft charge and was given probation. Father was arrested on November 13, 2013 for domestic assault of Mother. Father was asked where the domestic assult incident occurred, and he stated "I don't recall." Father testified that the domestic assault case was pending. He stated that he was scheduled to go back to court on August 18, 2014 and would be incarcerated until that time unless he made bond. Father's bond was set at $25,000.

Father admitted that he participated in the permanency plan meeting in January of 2013 and that he was given a list of the things that he needed to do in order to get the Children back. Father admitted that one of the things he was supposed to do was refrain from incurring new criminal charges and that he failed to accomplish this task.

Father testified that he had not done drugs "since the day my girls were taken from me. I've been sober and clean." He also testified that he had reported for drug screens "up until the incident. . . ."

Father testified that he thought he was working in construction in July of 2013. He could not recall how much money he was making. Father admitted that he never provided DCS with proof that he was working, a copy of his lease, a budget form, a childcare plan, or a transportation plan as required by the permanency plan. Father testified that he did not attend the second permanency plan meeting. He stated that he was working construction "all over the United States" and was not in Tennesse at that time. Father testified he was making "probably like 10 to $12 an hour at the time." Father admitted that he also was receiving room and board for working. Father testified that he was working for Heritage Tile and Marble in April of 2014 and was making between $10 and $12 per hour depending upon the job.

Father was asked what he would do if he were released on August 18th, and he stated that he would go back to work in Indiana. He testified that his mother lives there. Father testified that he and Mother were not together and had not been "for a long time," but when questioned further he admitted that he and Mother had another child together approximately four months prior to trial and that this baby was being cared for by Father's mother.

Father was asked about the incident that occurred during a visitation he and Mother had with the Children. He explained that the visitations had been taking place at McDonald's, but the foster parents suggested that Father come to their house to visit instead. During that visit Father was accused of theft of tools from the foster parents.

3

Father testified that the tools were found in Mother's mother's vehicle "[u]nder a third row seat underneath some beach towels and blankets." Father believes that the tools were planted there by someone else, and he made DCS aware of this allegation. Father testified that he and Mother separated after this incident. Father and Mother are not married.

Kelly A. was the Children's first foster mother. She testified in July of 2014 that the Children had been in her home for "[a] little over two years." Between the time that Kelly A. testified and the next day of trial, DCS moved the Children into a different foster home.

Kelly A. was asked about the incident Father had testified about, and she explained that she had left the home to allow the parents to visit with the Children while she went to run some errands. The visit was being supervised by the therapeutic visitation supervisor. Kelly A. testified that before she left her home she left tools just inside the door. She explained that someone was doing some work for her and her husband and was going to pick the tools up on that day. Kelly A. was gone from the home for approximately two hours. Her husband also was out of the house at that time. Kelly A. testified that the tools were gone when she returned to the home and that the therapeutic visitation supervisor told her that no one had stopped by to get them. Kelly A. testified that Father and Mother were outside at that time and that she "peeked" in their vehicle looking for the tools, which she stated she saw in the vehicle. Kelly A. called DCS and the Sheriff's Office. A sherriff's deputy got the tools out of Mother's vehicle.

Father admitted that he had been ordered to pay child support. He was asked how much, and Father stated: "I think $250 a year." Father was shown an order that ordered him to pay $10 per month per child for a total of $20 per month. Father was asked if he paid any of those payments, and he stated: "No, I didn't make none. I was just going to pay it at one time." Father testified that he maintained work throughout the case and admitted that he never has paid the child support of $10 per month per child. Father admitted that he has had no relationship with the Children since January of 2013.

Amanda McKinney testified that she is a DCS family service worker and that she has been assigned to this case the entire time that the Children have been in State custody, which at the time of trial was approximately two years. Ms. McKinney testified that Father exercised regular visitation with the Children between July 6, 2012 and January of 2013. Between May 27, 2013 and September 27, 2013 Father did not exercise any visitation. Father had eight possible visitations during the time period from May to September of 2013. Father was not incarcerated between May 27, 2013 and September 27, 2013. Ms. McKinney testified that Father did see the Children one time during that

4

time period when they were at court for an annual permanency hearing. She stated that this was not a visit, but that Father did get to see the Children. Ms. McKinney testified that Father did not visit the Children at all between December 8, 2013 and April 8, 2014, and Father was not incarcerated during that time period.

Ms. McKinney testified that there were issues with Father maintaining a consistent phone number. She stated that she would call and there would be no answer or the phone would be disconnected. When Ms. McKinney left messages for Father they were not returned.

Ms. McKinney testified that Father had not provided any documentation that he was working since he worked at Slick Pig in June of 2012. Ms. McKinney attempted to contact Father to come in for a drug screen in July of 2012 and was unable to reach him at home. After she was unable to contact Father at home in July of 2012, Ms. McKinney attempted to contact him at his job at Slick Pig and was informed that Father no longer worked there.

Ms. McKinney called Mother and Father on July 23, 2012 to come in for a drug screen and was unable to reach them. On August 3, 2012 Ms. McKinney left a voicemail message requesting that they come in for a drug screen, but Mother and Father did not come in for the drug screen. On August 7, 2012 Ms. McKinney again called, but there was no anwer. On August 8, 2012 Ms. McKinney called to set up a visitation, but there was no answer. On August 13, 2012 Father came in for drug screen and passed. When Ms. McKinney called on August 23, 2012 the phone was disconnected. She again called on August 30, 2012. Ms. McKinney stated that Mother and Father showed up for a drug screen the next day, which was August 31st, and both passed their drug screens. Ms. McKinney stated: "And so they showed up a day late, and so they passed their drug screens, but it wasn't really random because they didn't come in until the next day." On September 17, 2012 and October 3, 2012 Ms. McKinney called, and there was no answer. On November 9, 2012 Mother and Father cancelled their scheduled visitation and did not show up for their drug testing. When Ms. McKinney called on November 29, 2012 the phone was disconnected. On December 3, 2012 Ms. McKinney left a voicemail message. When she attempted to call on December 4, 2012 the phone again was disonnected. On December 7, 2012 Father took and passed a drug screen. Father took and passed a drug screen on January 10, 2013. Ms. McKinney was unable to reach Father on February 19, 20, and 26 of 2013. She stated:

> During the majority of this case, I only had one number to contact both of them on. They had shared a phone for the majority of this case, and they - - their numbers - - [Father] never provided me his own contact information for me to contact him at, so I only had the numbers that were provided by

them collectively. So [Mother] was the one that I got ahold [sic] of most - - majority of the time.

Ms. McKinney called in January of 2014, and Father answered the phone. This was the first time Ms. McKinney had spoken to Father since the permanency hearing on June 20, 2013. Father did not come in for drug screen after she spoke with him. Because it had been so long since Father had been in contact with DCS, Ms. McKinney made arrangements for a hair follicle test in January of 2014. She sent a letter telling Father that the funding had been approved for the hair follicle test. Father did not complete the hair follicle test.

Father did complete an A & D assessment, which recommended that he participate in individual therapy, participate in therapeutic visitation with the Children on a consistent basis, continue to be drug tested randomly, and comply with the recommendations of the permanency plan. Ms. McKinney discussed these recommendations with Father and provided him with a copy of his assessment.

Ms. McKinney testified that Father did establish paternity. Father and Mother provided a budget, but did not show where their income was coming from. They also provided a transportation plan that listed Mother as the transportation, but Mother did not have a valid driver's license. Ms. McKinney testified that the permanency plan was updated, but the action steps required of Father essentially remained the same with the exception that both Father and Mother were to address the domestic violence issue that arose in November of 2013.

Ms. McKinney testified that she does not believe that the Children could be returned safely to Father's home. She testified that Father had not visited the Children since January 28, 2013.

The trial resumed after a break of approximately two months. When Ms. McKinney again took the stand she testified that a few days after the previous day of trial the Children were moved to the home of Sherry W. ("Foster Mom") in response to issues that came to light during the testimony of the prior foster mother, Kelly A. Ms. McKinney explained that the Children were moved on July 11, 2014 and had been in the Foster Mom's home for approximately two months by the time of trial. Foster Mom lives with her sister and mother. Foster Mom's mother lives in the converted downstairs basement of the house. Foster Mom's sister and mother also have completed the resource parent training.

Ms. McKinney testified that the Children were doing great in the placement with Foster Mom. She stated:

I feel like this home is a better match than the home they were in before. I think I've seen a lot of changes, especially in [the older child]. I don't think I had realized in the placement that she was in before - - just kind of overshadowed that she was by her younger sister. And so to see her get the attention that she needs so that she could thrive and do well. And so they're both in daycare. The resource parents work at the daycare that they go to. And, I mean, they're really on top of everything, making sure that the girls' needs are met.

Ms. McKinney was asked to elaborate on the kind of changes she had seen, and she stated:

Well, mainly it's just been with [the older child]. She's just a brighter child. Her - - just her - - you know, her affect and just mood. I mean, it's just kind of like this little cloud has been kind of like removed over her head. Before I just simply - - just watching her, her disposition just kind of seemed kind of flat and I just felt that was just kind of her personality. But since living with [Foster Mom], I mean, she's just a completely different child. She's just - - I mean, she's always seemed happy before, but now, I mean, she's just a - - it's just different. And she's just very charismatic and we're just seeing more of her personality in her come out, and I think a lot of it is she's getting a lot more attention than she did before and just a lot of that care and nurturing that she needed. And so, you know, just seeing that in her and, you know, [the younger child's] - - she's - - not a lot has changed there. She's just getting older and bigger.

Ms. McKinney stated: "I feel better, a lot better about this placement. I think it's a better match."

Foster Mom testified that she is a preschool teacher and has been for sixteen years. She teaches four and five year olds to get them ready for kindergarten. Foster Mom was asked to describe what it was like when the Children first arrived in her home, and she stated:

They were inquisitive. [The younger child] cried a little bit, of course, because she had just woke up, and that's a new situation. But once we got home ate and, you know, got comfortable and played, and they just opened up pretty well. And they actually had a good first night. Even just doing the routine of bath and bed and everything, they did really well. . . . I would say their personality has gotten bigger and more open and learning

7

really well playing together and learning to play, like go play with toys and play together and coming up with their own - - they have great imaginations, let me tell you. They enjoy preschool. They love going. Even [the older child's] preschool teacher says she's just - - she's like she just wants to experience everything at one time. She has a big personality, and I just enjoy having them. They're really sweet. They're doing really well.

The Children share a bedroom and each has her own bed. Foster Mom testified that she would like to adopt the Children if they become available for adoption.

After trial the Juvenile Court entered its Order Terminating Parental Rights and Final Decree of Full Guardianship ("Judgment") on November 20, 2014 finding and holding, *inter alia*, that clear and convincing evidence was proven of grounds to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to visit; pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to support; pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii) for abandonment by failure to provide a suitable home; pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with the permanency plan; and pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. In its Judgment the Juvenile Court also found and held that clear and convincing evidence had been proven that it was in the Children's best interest for Father's parental rights to be terminated. With regard to best interest, the Juvenile Court specifically found and held:

> So therefore, finding more than one ground to terminate the parental rights of [Mother] and [Father], the Court moves to the best interest test and makes the following finding in facts and conclusions of law as to [Mother] and [Father]. The statute provides several non-exclusive factors to guide a court in determining the best interest of the children after finding that grounds for termination of parental rights exist.
>
> The one thing that concerns the Court most about this case is this case was that the [sic] testimony of the prior foster mother. The Court made notes and was concerned all through the testimony from the prior foster mother. We left Court on July 8, 2014 and Ms. McKinney had those children in another home on July 11, 2014. Ms. McKinney's testimony was that she walked out of this courtroom and she jumped right on it. Ms. McKinney said to herself, "I think we've got a problem." The Court did not know Ms. McKinney was immediately moving the children. The Court had credibility issues with that foster mother and her testimony. The

8

Department cannot make the people tell the truth. The Court is amazed and appreciative that Ms. McKinney jumped right on the safety concerns and changed that placement to make sure these children were safe. The Court thinks that is important in this case, because the children have been in the new home for two months.

The Court makes the following findings of fact related as to Best Interest and the factors set forth in the statute:

(1) "The Respondents have not made changes to their conduct or circumstances that would make it safe for the child to go home." Neither parent has had a lasting adjustment, and after extreme reasonable efforts by the Department to make it possible for the children to return home. Any adjustment in the near future is not reasonably possible. . . . Father sits here incarcerated. The Court finds that the Parents had issues. The Court finds that neither Parent has made an adjustment of circumstance, conduct, or condition to make it safe for the children to go back home to them anytime soon.

(2) "The Parents have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible." Despite the reasonable efforts from the state for a period of over two years, the parents have failed to effect a lasting adjustment after reasonable efforts. Ms. McKinney tried to make contact with these parents repeatedly. Ms. McKinney repeatedly tried to get the parents to participate in meetings, visits, etc., and she could not get in touch with the Parents. Father testified he could not participate in the permanency plan and could not participate in drug screens because he was traveling for work. It was Father's responsibility to make himself available. Father knew that. There is evidence from the Criteria and Procedures to Terminate Parental Rights and Permanency Plans. Father knew what his responsibilities were. Father knew his obligation and he knew the consequence of failing to comply with the Permanency Plan. The Court finds that both parents failed to effect a lasting adjustment after the reasonable efforts made by the Department after a long [sic] the children have spent over two years in state custody. Father is incarcerated today and cannot tell the Court when he will be released. . . .

(3) The Respondents, [Mother] and [Father], have not maintained regular visitation with the children such that a parent-child bond remains.

(4) There is no meaningful relationship between the Respondents, [Mother] and [Father], and the children. The Court finds that neither parent maintained regular visitation with the child by clear and convincing evidence. Father was not a part of the children's lives when he had every

opportunity to visit. . . . Father has not seen his children. Therefore, the Court finds by clear and convincing evidence, there is no relationship there. Father had every opportunity prior to his incarceration to have a relationship with these children. . . . Therefore, the Court finds that there's no meaningful relationship between either the father or the mother and the children.

(5) "Whether a change of caretaker and changing the physical environment of the child will have a negative impact on the child's emotional and psychological condition." This ground is the effect change of caretakers and physical environments like they [sic] have on the children's emotional, psychological, and medical condition. The Court does think that there was a snag due to the children being moved after the first day of trial, but the statute does not say for one of the best interest considerations for terminations [sic] parental rights to a child that the child has to be in the foster home at the time of the hearing for six months. It says it has got to be in the foster home for adoption for six months. Caregivers just changed two months ago. The Court does not have a crystal ball to see how the new home is going to work, so the Court gives no weight to this factor in either direction.

(6) The Respondents, [Mother] and [Father], have abandoned the children financially having not contributed to their support in a consistent and adequate manner without the ability to support the children in their home.

(7) The Respondents, [Mother] and [Father], have shown little or no interest in the welfare of the children and have abandoned the care of the children to the state. Further, the Court believes that it speaks volumes again for this factor is that within two months of moving these children to the new foster home, that a positive and impactful personality change has been seen in these children. The Court finds that these two children have blossomed in the two months they have been at the foster home.

(8) It is in the children's best interest to be adopted.

Therefore, based on these findings of fact, the Court makes the conclusion of law that it is in the best interest to terminate parental rights of [Mother] and [Father] to [the Children], and grants full guardianship of [the Children] to the Department of Children's Services.

Father appeals the termination of his parental rights to the Children to this Court.

10

## Discussion

Although not stated exactly as such, Father raises one issue on appeal: whether the Juvenile Court erred in finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).
>
> Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a

parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Father does not raise any issues with regard to the Juvenile Court's finding by clear and convincing evidence that grounds were proven to terminate Father's parental rights to the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to visit; pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(i) for abandonment by willful failure to support; pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(ii) for abandonment by failure to provide a suitable home; pursuant to Tenn. Code Ann. § 36-1-113(g)(2) for substantial noncompliance with the permanency plan; and pursuant to Tenn. Code Ann. § 36-1-113(g)(3) for persistent conditions. In the interest of completeness, we have carefully and thoroughly reviewed the record on appeal and have determined that the evidence in the record does not preponderate against the Juvenile Court's findings that all of the above stated grounds for termination were proven by clear and convincing evidence.

With regard to best interest, Father argues in his brief on appeal, in part, that this case is analogous to *In re: J.R.P.* in which the child was moved from one foster home into another during the pendency of the trial, and this Court stated: "Given the upheaval in Son's foster placement, the record does not show that termination of Mother's parental rights furthers the goal of achieving permanency for the child." *In re: J.R.P.*, No. M2012-02403-COA-R3-JV, 2013 WL 4477860, at *10 (Tenn. Ct. App. Aug. 19, 2013), *no appl. perm. appeal filed*. In *In re: J.R.P.* this Court reversed the trial court's termination of the mother's parental rights. *Id*. at *10-11.

The case now before us, however, is distinguishable from *In re: J.R.P.* in several key respects. First, in *In re: J.R.P.* the child had been in the new foster home for only "a *few days*" prior to the end of the trial. *Id.* at *10 (emphasis in original). In the case now

before us the Children had been in Foster Mom's home for approximately two months by the time the trial concluded.

Even more importantly, the mother in *In re: J.R.P.* was found to have "no criminal history," had "never had any drug, alcohol, or physical abuse issues," had exercised visits that "were regular, appropriate, and positive in tone, and were supported by Mother's frequent telephone calls," had attended her child's medical appointments and participated in medical decision making, and had exhibited "dogged determination to overcome the odds against her [which would] provide a powerful role model for a child with many obstacles of his own." *Id.* In short, the mother in *In re: J.R.P.* had been found to be "the only consistent adult presence in Son's life." *Id.*

In constrast, the facts in the case now before us are very different from the ones in *In re: J.R.P.* In the case now before us, Father continued to engage in criminal behavior while the Children were in State custody. Father admitted that he has paid no child support despite the fact that Father testified that he has been working and that he knew that he had an obligation to support the Children. Father also admitted that he had not visited with the Children for approximately eighteen months by the time of trial. The Children still were pre-school age at the time of trial, and eighteen months is a long time in their young lives. Father himself admitted that he has had no relationship with the Children since January of 2013. Father's assertion that this case is analogous to *In re: J.R.P.* is unconvincing.

As this Court has noted:

> Ascertaining the child's best interest in a termination proceeding is a fact intensive inquiry requiring the Court to weigh statutory factors as well as any other relevant factors. The child's best interest must be viewed from the child's, rather than the parent's perspective.
>
> Ascertaining the child's best interest does not call for rote examination of each of the factors in Tenn. Code Ann. § 36–1–113(i) and then a determination of whether the sum of the factors tips in favor of or against the parent. Depending upon the circumstances of a particular child and a particular parent the consideration of one factor may dictate the outcome of the analysis.

*In re the Adoption of D.P.E.*, 271 S.W.3d 670, 676 (Tenn. Ct. App. 2008) (citations omitted). Conversely, one factor taken alone may simply be insufficient to dictate the outcome of the analysis. In the case now before us the Juvenile Court properly considered *all* of the relevant factors when making its decision regarding best interest. In

13

fact, the Juvenile Court weighed the relevant factors giving consideration to the fact that the Children had been moved to a new foster home during the pendency of the trial. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated. We find no error in the Juvenile Court's determination with regard to best interest.

As grounds for termination were proven by clear and convincing evidence and it also was proven by clear and convincing evidence that it was in the Children's best interest for Father's parental rights to be terminated, we affirm the Juvenile Court's November 20, 2014 judgment terminating Father's parental rights to the Children.

## <u>Conclusion</u>

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the appellant, Joshua L.

_____
D. MICHAEL SWINEY, JUDGE